**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE,
NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| BRYANT C. DUNAWAY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 2:19-cv-00038 |
| | ) | |
| v. | ) | Judge Aleta A. Trauger |
| | ) | |
| PURDUE PHARMA L.P., ET AL.. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT MCKESSON CORPORATION'S
RESPONSE TO PLAINTIFFS' MOTION TO REMAND**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

I.     Plaintiffs' Action............................................................................................... 2

II.    The Multidistrict Litigation.............................................................................. 3

ARGUMENT ..................................................................................................................... 3

I.     The Court Should Defer Consideration of the Remand Motion. ...................... 3

II.    Removal was Procedurally Proper and Did Not Require the Consent of Nominal Defendants. ...................................................................................................... 4

III.   Plaintiffs' Second Amended Complaint Necessarily Raises Federal Issues. .................... 7

      A.    The Complaint "Necessarily Raises" Federal Questions........................ 8

      B.    The Parties "Actually Dispute" the Federal Issues. ............................. 12

      C.    The Federal Issues Are "Substantial." ................................................ 13

      D.    Federal Jurisdiction Will Not Disrupt the Congressionally Approved Balance of Federal-State Judicial Responsibilities. ............................. 17

IV.   The Remand Decisions Cited by Plaintiffs Are Distinguishable and the MDL Court Has Not Rejected McKesson's Asserted Ground for Removal. ........................... 17

V.    Plaintiffs' Request for Fees and Costs Should Be Denied................................ 19

CONCLUSION ................................................................................................................ 20

4827-4521-9479

# INTRODUCTION

McKesson Corporation ("McKesson") removed this case because Plaintiffs assert claims against distributors of prescription opioids (collectively, "Distributors") alleging violations of the federal Controlled Substances Act, 21 U.S.C. § 801, *et seq.* (the "CSA"). (D.E. 1.) Plaintiffs' reliance on federal law creates federal question jurisdiction under 28 U.S.C. § 1331.

As a threshold matter, this Court need not and should not reach the merits of Plaintiffs' remand motion. Instead, this Court should do as numerous district courts across the country have done in nearly identical cases, and defer consideration of remand to allow the Judicial Panel on Multidistrict Litigation ("JPML") to decide whether to transfer this action to the Northern District of Ohio (the "MDL") alongside similar actions brought by other plaintiffs across the country as part of the national consolidated opioid litigation.

Were this Court to reach the merits of Plaintiffs' remand motion, the Court should deny it. Federal jurisdiction is proper under the Supreme Court's four-part test set forth in *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308 (2005), and *Gunn v. Minton*, 568 U.S. 251 (2013). Under that test, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258.

All four factors are present here. *First*, Plaintiffs' SAC necessarily raises federal issues because their claims—which rest on alleged failures to report and halt "suspicious orders" for prescription opioids—are expressly premised on alleged violations of the CSA. *Second*, the parties actually dispute the federal issues because they contest whether those duties exist under the CSA and, if so, whether Distributors violated them. *Third*, the federal issues are substantial given the federal interest in the CSA's nationwide regulatory scheme and the federal government's asserted interests. And *fourth*, federal jurisdiction will not upset any federal-state balance.

4827-4521-9479

# BACKGROUND

## I.   PLAINTIFFS' ACTION

In March 2019, Plaintiffs filed a Second Amended Complaint ("SAC") naming Distributors as defendants (*Id.* ¶ 4), and asserting two counts under the Tennessee Drug Dealer Liability Act (*Id.* ¶ 11). Plaintiffs' theory of liability against Distributors is that they allegedly violated two purported duties aimed at preventing "diversion" of controlled substances: (1) a duty to report "suspicious orders"; and (2) a duty to halt shipments of suspicious orders. *See, e.g.*, SAC ¶ 10 (Distributors "had a responsibility not to fill suspicious orders," and that "despite recognizing orders that reflected diversion, the Distributor Defendants processed and filled them anyway").

To establish these alleged duties, the SAC relies on federal law—specifically, the CSA, related regulations, and DEA guidance. The alleged reporting duty is set forth in the CSA's implementing regulations. *See* 21 C.F.R. § 1301.74(b). The alleged shipment-halting duty arises out of the DEA's interpretation of the CSA, pursuant to which Distributors must "decline to ship" suspicious orders. *See Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 212-13 (D.C. Cir. 2017) (citing *In re Southwood Pharm., Inc.*, 72 Fed. Reg. 36,487, 36,500-501 (DEA July 3, 2007), as the source of DEA's "Shipping Requirement"). Furthermore, DEA regulations define the term "suspicious order." *See* 21 C.F.R. § 1301.74(b) ("Suspicious orders include orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency.").

Plaintiffs therefore allege that Distributors violated duties that, according to the SAC, arise under the CSA. Indeed, Plaintiffs rely on the CSA to establish these alleged duties. *See, e.g.*, SAC ¶ 305 (citing DEA guidance interpreting 21 U.S.C. § 823 as source of duty to report suspicious orders); SAC ¶ 351 (alleging that a Distributor Defendant "violat[ed] the CSA and the CSA's implementing regulations"); SAC ¶¶ 305-08 (citing DEA guidance to establish alleged duty to halt suspicious orders). Plaintiffs fail to locate a state law source for these alleged requirements.

4827-4521-9479

## II.     THE MULTIDISTRICT LITIGATION

Plaintiffs' claims are also identical to claims already being asserted in federal court by hundreds of plaintiffs against opioid manufacturers, distributors, and pharmacies. To consolidate these cases for coordinated pre-trial proceedings, the JPML formed an MDL in the Northern District of Ohio. *See In re Nat'l Prescription Opiate Litig.*, 290 F. Supp. 3d 1375 (J.P.M.L. 2017). In total, more than 1,800 actions are pending in the MDL, including actions originally filed in this District.[1] As new cases are filed each week, the JPML continues to transfer actions to the MDL.

Upon removal, a notice was filed with the JPML tagging this case for potential transfer to the MDL. JPML D.E. 4326.[2] The JPML then conditionally ordered that this case should be transferred to the MDL because it appears to "involve questions of fact that are common to the actions previously transferred to the Northern District of Ohio and assigned to Judge Polster." JPML D.E. 4353 (D.E. 44). If Plaintiffs file an opposition to transfer, the JPML will automatically stay its conditional order and issue a briefing schedule on transfer. McKesson anticipates that the JPML will make a transfer decision after its next available hearing on July 25.

## ARGUMENT

## I.     THE COURT SHOULD DEFER CONSIDERATION OF THE REMAND MOTION.

Although Plaintiffs' SAC necessarily raises substantial federal issues, the Court may and should defer ruling on Plaintiffs' remand motion altogether. Delaying consideration of Plaintiffs'

---

[1] *See, e.g.*, *Smith Cty. v. Purdue Pharma LP*, No. 2:17-cv-00078 (M.D. Tenn.); *Fentress Cty. v. ABDC*, No. 2:18-cv-00028 (M.D. Tenn.); *Pickett Cty. v. AmerisourceBergen Drug Corp.*, No. 2:18-cv-00020 (M.D. Tenn.); *Overton Cty. v. ABDC*, No. 2:18-cv-00031 (M.D. Tenn.); *Metro. Gov't of Nashville & Davidson Cty. v. Purdue Pharma LP*, No. 3:17-cv-01605 (M.D. Tenn.); *Williamson Cty. v. ABDC*, No. 3:18-cv-00008 (M.D. Tenn.); *Rutherford Cty. v. Purdue Pharma LP*, No. 3:18-cv-00238 (M.D. Tenn.); *Montgomery Cty. v. ABDC*, No. 3:18-cv-00314 (M.D. Tenn.); *Sumner Cty. v. Purdue Pharma LP*, No. 3:18-cv-00241 (M.D. Tenn.); *Cannon Cty. v. Purdue Pharma LP*, No. 3:18-cv-00614 (M.D. Tenn.).

[2] "JPML D.E." refers to entries in *In re Nat'l Prescription Opiate Litig.*, MDL No. 2804 (J.P.M.L.).

4827-4521-9479

remand motion until the JPML makes a final transfer decision will promote judicial efficiency and ensure consistent remand rulings by allowing the MDL court to consider Plaintiffs' remand motion together with the many other remand motions already before it which present the same issues.

"As other district courts within the Sixth Circuit have recognized, the 'general rule is for federal courts to defer ruling on pending motions to remand in MDL litigation until after the [JPML] has transferred the case.'" *Beshear v. Volkswagen Grp. of Am., Inc.*, 2016 WL 3040492, at *8 (E.D. Ky. May 25, 2016). This is so because deferring consideration of a remand motion promotes judicial economy. If the JPML transfers the case, the MDL judge can rule on Plaintiffs' remand motion in conjunction with all other remand motions presenting the same jurisdictional issue, thereby preserving judicial resources, ensuring consistent decisions, and avoiding the risk of duplicative litigation. For these reasons, this Court routinely stays proceedings and defers consideration of remand motions in cases that will potentially transfer to an MDL. *See, e.g., Tenn. ex rel. Cooper v. McGraw-Hill Cos.*, 2013 WL 1785512, at *7 (M.D. Tenn. Apr. 25, 2013) (staying proceedings and deferring consideration of remand motion pending MDL transfer decision); *Karrels v. Morgan Asset Mgmt., Inc.*, 2010 WL 11565140, at *2 (M.D. Tenn. Jan. 6, 2010) (same).

As Distributors explain in their motion to stay (D.E. 29, 30), many federal courts have stayed proceedings or otherwise deferred consideration of pending remand motions presenting the same jurisdictional issue as Plaintiffs' motion, so that the JPML may decide whether to transfer the action to the MDL. To promote judicial economy and ensure consistent rulings, the Court should defer consideration of Plaintiffs' motion and allow the MDL court to address it.

## II.  REMOVAL WAS PROCEDURALLY PROPER AND DID NOT REQUIRE THE CONSENT OF NOMINAL DEFENDANTS.

Plaintiffs contend that McKesson's removal was defective because it failed to obtain the consent of four defendants: Paul Haskins, David Florence, Lynnville Family Medical Center, LLC

4827-4521-9479

4

("Lynnville"), and the Center for Advance Medicine, LLC ("CAM"). (D.E. 19 at 5-6.)[3] A removing defendant need not obtain the consent of unserved parties. *See Underwood v. Ciena Health Care Mgmt., Inc.*, 2008 WL 1776961, at *1 n.2 (E.D. Mich. Apr. 17, 2008) ("[T]he consent of an unserved defendant is not required for removal."). Likewise, a removing defendant need not obtain the consent of *nominal* defendants. *See Beasley v. Wells Fargo Bank, N.A.*, 2017 WL 2670892, at *3 (M.D. Tenn. June 21, 2017) ("[N]ominal parties are excepted from the requirement that all defendants join in or consent to removal to federal court."). "Nominal means simply a party having no immediately apparent stake in the litigation either prior or subsequent to the act of removal." *Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 260 (4th Cir. 2013).

At least three of the defendants Plaintiffs identify were never served. When counsel for McKesson called Florence on April 26, 2019, Florence denied any knowledge of this action. Decl. of Robert D. Boon II, Esq., ¶ 2. When McKesson's counsel contacted Florence's counsel in another

---

[3] In passing, Plaintiffs suggest that McKesson did not timely notify them of removal. (See D.E. 19 at 3 & nn.3, 4.) Plaintiffs are mistaken. 28 U.S.C. § 1446(d) provides that "[p]romptly after the filing of [a] notice of removal of a civil action the defendant or defendants shall give written notice thereof to all adverse parties." Here, McKesson timely filed its Notice of Removal via this Court's ECF system on Friday, May 3, 2019. That same day, counsel for McKesson placed copies of the Notice of Filing of Removal filed with the Circuit Court for Cumberland County in the mail to Plaintiffs. Boon Decl. at ¶ 11. On Monday May 6, 2019, counsel for McKesson also sent a copy of the Notice of Removal by email to Plaintiffs' counsel, including Ms. Herzfeld. *Id*. Under those circumstances, McKesson plainly provided prompt notice of removal. *See Alpena Power Co. v. Util. Workers Union of Am., Local 286*, 674 F. Supp. 1286, 1287 (E.D. Mich. 1987) (written notice of removal provided 13 days after removal is "prompt" within meaning of §1446(e)); *Phillips v. NationStar Mortg., LLC*, 2014 WL 12775194, at *3 (M.D. Tenn. July 2, 2014) ("As only four days elapsed between the date of filing of the Notice of Removal and receipt via regular mail by Plaintiff's counsel, the Court finds Defendants promptly served the Notice of Removal on Plaintiff's counsel."); *Titan Finishes Corp. v. Spectrum Sales Grp.*, 452 F. Supp. 2d 692, 696 (E.D. Mich. 2006) (written notice 4 days after removal was sufficiently "prompt"); *cf. Lee v. Smith & Wesson Corp.*, 2011 WL 5507192, at *2 (N.D. Ohio Oct. 24, 2011) (Polster, J.) ("The Court therefore finds that a delay of 23 days between filing a notice of removal in federal court and filing a copy of that notice with the state court is prompt enough to satisfy the requirements under 28 U.S.C. § 1446(d).").

4827-4521-9479

matter, Robert L. Huskey, Mr. Huskey stated that Florence had never been served with the complaint in this action. *Id.* ¶¶ 3-4. With respect to Haskins, the return of service Plaintiffs filed fails to prove that he was ever served. It states that service was perfected "by personal service," but fails to identify the name of the person served, contrary to Tenn. R. Civ. P. 4.03(1). Decl. of Tricia Herzfeld, Exhibit 1 (D.E. 20).[4] With respect to Lynnville, service also appears never to have been properly effected. The return on service states "Personal Service/Did leave a copy with Edith Wiles." Herzfeld Decl., Exh. 4 (D.E. 20), but whoever Ms. Wiles is, she is not the authorized agent since she appears nowhere on the Tennessee Secretary of State's website. Boon Dec. ¶ 9. Nor is there any indication that Ms. Wiles is "an officer or managing agent of the association," or "an agent authorized by appointment or by law to receive service on behalf of the . . . association." Tenn. R. Civ. P. 4.04(3). Moreover, the return of service was delivered to an address—118 2nd Avenue South, Lewisburg, TN 37091 (Herzfeld Dec., Exh. 4 (D.E. 20))—other than Lynnville's primary place of business. *See* Boon Decl. ¶ 9. As such, it is not clear Lynnville was ever served.[5]

These defendants are also nominal because they have no immediately apparent stake in the litigation and Plaintiffs' conduct makes clear that they seek no real relief from these defendants. Haskins and Florence were named in the original complaint in January 2018 (D.E. 19 at 2-3) and Plaintiffs claim they served these defendants in February 2018 (D.E. 20 at ¶ 4). Lynnville and CAM were named in the first amended complaint in August 2018 (D.E. 19 at 3) and Plaintiffs

---

[4] When McKesson's counsel contacted Haskins on April 30, 2019, Haskins was unable to confirm whether he had been served with the complaint. After calling him to again to verify whether he had been served, Haskins ended the call and refused all other attempts to contact him. Boon Decl. at ¶ 7.

[5] Counsel for McKesson also attempted to contact Lynnville. Each of the telephone numbers that could be located via online searches was either not in service or went unanswered (Boon Decl. at ¶ 8), a Google search for Lynnville indicated that it was "permanently" closed (*Id.*) and the Tennessee Secretary of State's website did not identify a registered agent. *Id.*

4827-4521-9487

claim they served these defendants that same month (D.E. 20 at ¶ 5). Notwithstanding Plaintiffs' purported service, these four defendants have not appeared in the action, have not responded to the complaint, and have not otherwise participated in the litigation in any meaningful way. *See Cedar Lake Homeowners Ass'n v. Nw. Empire Cmty. Mgmt., Inc.*, 2016 WL 11384520, at *1 (D. Or. Oct. 12, 2016) (party is "a nominal defendant only" where it "tak[es] no active role in the litigation").

Plaintiffs have not sought a default judgment, nor have they sought any meaningful discovery from any these defendants. Despite Haskin's and Florence's nearly year-and-a-half absence from this action, and Lynnville and CAM's nearly nine-month absence, there is no indication that Plaintiffs have pursued their claims against these defendants. Indeed, even though counsel for McKesson was able to locate and contact both Haskins and Florence, they each denied knowledge of this action or their involvement in it, further evidencing their role as nominal defendants. In short, the nonconsenting defendants have only a "trifling" role in this litigation, "[e]xisting in name only," which demonstrates their nominal status. *Hartford*, 736 F.3d at 260.

Lynnville and CAM are also nominal defendants because they are defunct business entities. As this Court has explained, "[t]he term ['nominal party'] has specifically been held to include defunct business entities." *Wellgen Standard, LLC v. Maximum Legal Holdings, LLC*, 2019 WL 1043395, at *2 (M.D. Tenn. Mar. 5, 2019). The Tennessee Secretary of State's website indicates that CAM's entity filing status was changed to "Inactive - Dissolved (Administrative)" on August 8, 2015—almost three years before this complaint was filed—and that Lynnville's status was changed to "Inactive – Terminated" on May 3, 2019. *See* Boon Decl., ¶¶ 5, 9, Exs A, C.

## III.    PLAINTIFFS' SAC NECESSARILY RAISES FEDERAL ISSUES.

Even if the Court were inclined to consider Plaintiffs' remand motion, federal jurisdiction is proper given Plaintiffs' exclusive reliance on federal law. Although Plaintiffs assert state law

causes of actions, their claims are predicated on alleged violations of the CSA. Accordingly, those claims necessarily raise substantial federal issues that should be resolved in federal court.

Federal district courts have removal jurisdiction over "any civil action brought in a State court of which the district courts of the United States have original jurisdiction," 28 U.S.C. § 1441(a), and original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331. "A single claim over which federal-question jurisdiction exists is sufficient to allow removal." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 194 (2d Cir. 2005); *see Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 563 (2005).

Even where state law creates the causes of action, they may raise federal issues sufficient to warrant removal jurisdiction. Under the Supreme Court's *Grable* and *Gunn* decisions, "federal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn*, 568 U.S. at 258. "Where all four of these requirements are met . . . jurisdiction is proper because there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum, which can be vindicated without disrupting Congress's intended division of labor between state and federal courts." *Id*.

### A.    The Complaint "Necessarily Raises" Federal Questions.

The artful pleading doctrine "empowers courts to look beneath the face of the complaint to divine the underlying nature of a claim, to determine whether the plaintiff has sought to defeat removal by asserting a federal claim under state-law colors." *BIW Deceived v. Local S6, Indus. Union*, 132 F.3d 824, 831 (1st Cir. 1997). "In other words, a plaintiff may not, by the expedient of artful pleading, defeat a defendant's legitimate right to a federal forum." *Id.*

An action "necessarily raises" a federal question when "the right to relief depends upon the construction or application of federal law." *PNC Bank, N.A. v. PPL Elec. Utils. Corp.*, 189 F.

4827-4521-9479

App'x 101, 104 n.3 (3d Cir. 2006). Significantly, "an action under 28 U.S.C. § 1331(a) arises . . . *if the action requires construction of a federal statute*, or at least a distinctive policy of a federal statute requires the application of federal legal principles." *V.I. Hous. Auth. v. Coastal Gen. Constr. Servs. Corp.*, 27 F.3d 911, 916 (3d Cir. 1994) (emphasis added); *see also Merrell Dow Pharms. v. Thompson*, 478 U.S. 804, 808–09 (1986) (federal question jurisdiction exists if "vindication of a right under state law *necessarily turn*[*s*] *on some construction of federal law*" (emphasis added).

In determining whether state law claims turn on construction or application of federal law, the Court must "begin by considering the duty underlying each claim." *NASDAQ OMX Grp., Inc. v. UBS Sec., LLC*, 770 F.3d 1010, 1031 (2d Cir. 2014). "A state-law claim 'necessarily' raises federal questions where the claim is affirmatively 'premised' on a violation of federal law," *New York ex rel. Jacobson v. Wells Fargo Nat'l Bank, NA*, 824 F.3d 308, 315 (2d Cir. 2016), or where the "singular duty" underlying the claim arises under federal law. *NASDAQ*, 770 F.3d at 1021.

Here, Plaintiffs' claims necessarily raise federal issues because they are expressly premised on Distributors' alleged violations of legal duties that, according to Plaintiff, arise out of the CSA and its implementing regulations—*i.e.*, the duties to report and halt suspicious orders for controlled substances. *See* 21 C.F.R. § 1301.74(b) (setting forth reporting requirement); *Masters Pharm*, 861 F.3d at 212-13 (discussing shipping requirement). Despite their protestations to the contrary, Plaintiffs' reliance on federal law is evident on the face of the SAC.

Throughout the Complaint, Plaintiffs cite to federal sources to establish the alleged duties to report and halt suspicious orders, and repeatedly plead that Distributors' alleged violations of these duties give rise to Plaintiffs' causes of action. For example:

- A September 27, 2006 letter from DEA "provides that 'in addition to reporting all suspicious orders, a distributor has a statutory responsibility to exercise due diligence to avoid filling suspicious orders that might be diverted into other than legitimate medical, scientific, and industrial channels.'" SAC ¶ 305.

- A December 27, 2007, letter from DEA "also references the final orders issues in *Southwood Pharmaceuticals, Inc.*, 72 FR 36487 (2007), which 'in addition to discussing the obligation to report suspicious orders when discovered' and 'some criteria to use when determining whether an order is suspicious,' the order 'also specifically discusses your obligation to maintain effective controls against the diversion of controlled substances.'" SAC ¶ 308 (alteration omitted).

- A Distributor defendant "distributed hydrocodone to various pharmacies, even though the company knew that many of the orders placed by the pharmacies were of an unusual size and were 'suspicious' as defined in the CSA." SAC ¶ 329.

- "[T]he DEA had reason to believe that [certain Distributors] were not adhering to their obligation under the CSA." SAC ¶ 332.

- A Distributor Defendant "began violating the CSA" after entering a Memorandum of Agreement with DEA. SAC ¶ 335.

- "The Distributor Defendants knew they should monitor, detect, and halt suspicious orders." SAC ¶ 295.

- "The Drug Distributors facilitated illegal drug transactions in Tennessee by submitting suspicious orders, having them filled, and stocking suspect pharmacies and dispensing physicians with opioids destined for the illegal drug market. They had a choice when faced with suspicious orders: submit them or impound them and investigate until they actually cleared suspicion. They consistently chose to ship opioids to downstream buyers who were likely . . . diverting prescription opioids." SAC ¶ 291.

As these and other examples demonstrate, Plaintiffs' claims against Distributors rest squarely on their allegations that Distributors breached alleged duties that Plaintiffs base on the CSA and DEA regulations. Plaintiffs' invocation of federal law undergirds its entire theory against Distributors.

Although a plaintiff "may avoid federal jurisdiction by *exclusive* reliance on state law," *Caterpillar*, 482 U.S. at 392 (emphasis added), Plaintiffs fail to cite a single state law authority that requires wholesale distributors to report or halt shipments of suspicious orders for controlled substances—instead relying on federal law. *See, e.g.*, SAC ¶ 305-08. Thus, to prevail on their claims as pleaded, Plaintiffs would have to establish that Distributors breached federal duties.

Plaintiffs' claims under the Tennessee Drug Dealer Liability Act illustrate the point. Plaintiffs allege that Distributors "had a responsibility not to procure or fill suspicious orders" and

"violated these responsibilities through the various acts referenced herein." SAC ¶ 646 (Count I); SAC ¶ 673 (Count II). Plaintiffs further allege that Distributors "[r]outinely fill[ed] suspicious orders" and "[r]outinely fill[ed] orders, including plainly suspicious orders, without due diligence." SAC ¶ 649. But, as noted, Plaintiffs principally rely on the CSA, its implementing regulations, and DEA guidance to establish the purported duties to monitor, detect, report, and then not fill suspicious orders. Thus, to establish their claims *as pleaded*, Plaintiffs must show that that Distributors violated the CSA and the claim necessarily raises a federal issue. *See Benjamin v. S.C. Elec. & Gas Co.*, 2016 WL 3180100, at *5 (D.S.C. June 8, 2016) ("While Plaintiffs' allegations of negligence appear on their face to not reference federal law, federal issues are cognizable as the source for the duty of care resulting from [the defendant's conduct].").

In short, Plaintiffs' state law causes of action hinge on their allegations that Distributors breached the CSA and its implementing regulations. To determine whether Distributors breached those duties, a court would necessarily have to interpret and apply the CSA.

Plaintiffs nonetheless assert in their remand motion that "McKesson had an obligation under Tennessee's Drug Control Act and Tennessee Board of Pharmacy regulations to monitor and report suspicious orders, and that it violated those obligations." (D.E. 19 at 9.) In support, Plaintiffs point to footnotes in the SAC (¶¶ 8 n.7, 100 n.34, and 647 n.448), which in turn cite four state law sources: (i) T.C.A. § 53-11-302, (ii) T.C.A. § 53-11-303; and (iii) Tennessee Board of Pharmacy Rules, Ch. 1140-02.01 *et seq.*; and (iv) Board of Pharmacy Rules, Ch. 1140-09.01 *et seq. Not one* of those provisions relates to obligations to report and not fill suspicious orders. T.C.A. § 53-11-302, requires only that manufacturers, distributors, and dispensers of controlled substances to register with the state board of pharmacy. T.C.A. § 53-11-303 sets forth factors that the state board of pharmacy considers in issuing a license. Board of Pharmacy Rules, Ch. 1140-

02-.01 *et seq.*, sets forth the professional conduct and responsibilities for pharmacists. Board of Pharmacy Rules, Ch. 1140-09-.01 *et seq.*, contains general rules governing license applications for distributors, minimum requirements for general operations, and general requirements aimed at physical security. *Not one* of these four sources mentions anything relating to reporting or halting suspicious order. And while Plaintiffs claims that there is a "duty under the Tennessee Drug Control Act to monitor and report suspicious orders" (D.E. 19 at 10), the term "suspicious order" does not appear *even once* in that Act or in the Pharmacy Rules. As the SAC recognizes, DEA regulations define that term. *See* 21 C.F.R. § 1301.74(b) (defining "suspicious orders"); SAC ¶ 329 ("[O]rders … were 'suspicious' *as defined in the CSA*." (emphasis added)).

Plaintiffs' theory of liability also relies on an expansive reading of federal law that calls into question agency determinations. Plaintiffs allege not only that Distributors should have detected and reported discrete suspicious orders, but that Distributors should have recognized that the *total volume* of prescription opioids distributed by *all* wholesalers to various regions was suspicious or unreasonable. *See, e.g.*, SAC ¶ 298 ("The sheer volume of prescription opioids distributed to pharmacies in the Counties … is … facially suspicious."). But the total amount of prescription opioids distributed in a given year turns on annual aggregate production quotas established by DEA (21 C.F.R. § 1303.11(b)(4)), which are determined based on "[p]rojected demand" for such substances (21 C.F.R. § 1303.11(a)). To show that the total quantity of prescription opioids distributed was unreasonable, Plaintiffs would necessarily have to show that the annual production quotas set by DEA, pursuant to a federal statute, were unreasonable.

### B. The Parties "Actually Dispute" the Federal Issues.

The federal issues raised by the SAC are "actually disputed" because the parties contest whether the CSA and its implementing regulations in fact give rise to the duties upon which Plaintiffs' claims rely, the scope and contours of any such duties that might exist, and whether

4827-4521-9479

Distributors violated these alleged duties by failing to report and halt suspicious orders. Indeed, because Plaintiffs' claims against Distributors depend on their theory that Distributors breached these alleged duties, this issue is the "central point of dispute." *Gunn*, 568 U.S. at 259.

Given these live disputes about the existence and scope of duties under the CSA, Plaintiffs cannot credibly maintain, as they do in their remand motion (D.E. 19 at 9) that no federal issue is actually disputed. Distributors deny that the alleged duties under the CSA are as broad in scope as Plaintiffs allege and Distributors deny that they violated the CSA in the manner alleged in the SAC. Unless Plaintiffs are willing to concede both points, the federal issues are actually disputed.

**C.      The Federal Issues Are "Substantial."**

The Supreme Court has explained that "[t]he substantiality inquiry under *Grable* looks . . . to the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260. A federal issue "can be important for many reasons," including because (i) "state adjudication would undermine the development of a uniform body of federal law"; (ii) "resolution of the issue has broad significance for the federal government"; or (iii) "the case presents a nearly pure issue of law that would have applications to other federal cases." *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 724 (5th Cir. 2017) (quotation marks omitted). Exercising federal-question jurisdiction in such cases "captures the commonsense notion that a federal court ought to be able to hear claims recognized under state law that nonetheless turn on substantial questions of federal law, and thus justify resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Grable*, 545 U.S. at 312.

**1.      There is a federal interest in ensuring uniform interpretation of CSA.**

Courts have often found federal issues to be sufficiently substantial where they raise "questions [that] involve aspects of . . . complex federal regulatory scheme[s] . . . as to which there is a serious federal interest in claiming the advantages thought to be inherent in a federal forum."

4827-4521-9479

13

*Broder*, 418 F.3d at 195 (state law claims premised on violations of Communication Act's uniform rate requirement satisfy *Grable*) (quotation marks omitted); *see, e.g.*, *PNC Bank*, 189 F. App'x 101, 104 n.3 (state law claim based on violation of Internal Revenue Code "gives rise to federal-question jurisdiction" under *Grable*); *NASDAQ*, 770 F.3d at 1031 (state law claims premised on violations of Exchange Act satisfy *Grable*); *Jacobson*, 824 F.3d at 315-18 (state law claims based on violation of Internal Revenue Code satisfy *Grable*); *Ranck v. Mt. Hood Cable Regulatory Comm'n*, 2017 WL 1752954, at *5 (D. Or. May 2, 2017) (state law claims based on violations of Cable Communications Policy Act satisfy *Grable*)..

Such rulings are common where federal agencies are responsible for implementing a national regulatory system for which uniformity is essential. In *NASDAQ*, for example, the Second Circuit ruled that "the disputed federal issue in th[e] case—whether [the defendant] violated its Exchange Act obligation to provide a fair and orderly market in conducting an IPO—is sufficiently significant to the development of a uniform body of federal securities regulation to satisfy the requirement of importance to the federal system as a whole." 770 F.3d at 1024. Likewise, in *Jacobson*, the Second Circuit held that "minimizing uncertainty over the tax treatment of mortgage-backed securities, as Congress intended, fully justif[ied] resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." 824 F.3d at 318.

Similarly, Plaintiffs' claims would require a court to determine the existence and scope of Distributors' obligations under the CSA, implicating the uniformity concerns addressed above. In enacting the CSA, Congress stated that it was "providing the legitimate drug industry with a *unified* approach to narcotic and dangerous drug control." H.R. Rep. No. 91-1444 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4566, 4572 (emphasis added). Plaintiffs' claims thus "involve aspects of the complex federal regulatory scheme applicable to" the national prescription drug supply chain,

*Broder*, 418 F.3d at 195, and are "sufficiently significant to the development of a uniform body of [controlled substances] regulation to satisfy the requirement of importance to the federal system as a whole," *NASDAQ*, 770 F.3d at 1024. Furthermore, "minimizing uncertainty over" reporting and shipping obligations under the CSA "justifies resort to the experience, solicitude, and hope of uniformity that a federal forum offers on federal issues." *Jacobson*, 824 F.3d at 317–18.

Resort to a federal forum is particularly warranted here because Plaintiffs' action is but one of more than 1,800 federal cases, almost all of which are pending in the MDL. If this case is allowed to proceed in federal court and transferred to the MDL, the MDL court will be able to ensure uniform construction and application of the CSA and any alleged duties arising under it, achieving Congress's goal of a "unified approach" to regulating controlled substances. But if this case were remanded to state court, nothing would prevent that court from construing and applying federal CSA obligations in a manner inconsistent with the MDL court and with federal policy.

### 2. The federal issues have broad significance to the federal government.

The federal government has made clear the effect that the opioid litigation will have on its ability to enforce the CSA. Most notably, the Department of Justice filed a Statement of Interest in the MDL, asserting the federal government's interests in, among other things, its "law enforcement and legal activities in conjunction . . . with the [MDL]," specifically including "[c]riminal and civil tools available *under the* [*CSA*]." *In re: Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804 (N.D. Ohio Mar. 1, 2018), D.E. 161 (emphasis added) (attached as **Ex. 2**).

Allowing state courts to resolve claims premised on the CSA—and to determine the existence and scope of federal duties—creates the potential for inconsistent interpretations of the CSA across jurisdictions. *See* 21 U.S.C. § 903 (although Congress did not intend to "occupy the field" of controlled substances regulation with CSA, it pre-empts inconsistent state law). Allowing

state courts to issue conflicting interpretations of the CSA would inevitably undermine the federal government's efforts to enforce the statute and sow confusion among federally regulated entities.

### 3. The federal issues are nearly pure issues of law.

As noted, this case would require a court to determine the existence of duties arising under the CSA, the scope and contour of any such duties that exist, and "whether [Distributors' conduct] amounted to a breach of that duty." *NASDAQ*, 770 F.3d. at 1023. These questions present "nearly pure issue[s] of law" that would necessarily "have applications to other federal cases." *Tenn. Gas Pipeline*, 850 F.3d at 724. Indeed, these issues apply to the hundreds of actions in the MDL.

### 4. A federal cause of action is not required for federal jurisdiction.

Although Plaintiffs correctly recognize that "the CSA contains no private cause of action" (D.E. 19 at 11), the lack of a private cause of action does *not* render federal jurisdiction lacking. In *Grable*, the Supreme Court held that the lack of a federal cause of action does *not* foreclose federal-question jurisdiction, and found that the federal issue presented in that case was sufficiently substantial notwithstanding the lack of a federal cause of action. *See Broder*, 418 F.3d at 196 ("The *Grable* Court found this last requirement to be satisfied even in the absence of a private right of action."); *see also, e.g.*, *Ranck*, 2017 WL 1752954, at *4 ("In *Grable*, the Supreme Court expressly rejected this line of reasoning [that lack of a private right of action precludes substantiality], finding that applying *Merrell Dow* in this way would both 'overturn[ ] decades of precedent,' and 'convert[] a federal cause of action from a sufficient condition for federal-question jurisdiction into a necessary one.' *Grable*, 545 U.S. at 316."). Thus, the fact that the CSA does not afford Plaintiffs a private right of action does not diminish the substantiality of the federal questions here, particularly when federal courts have exclusive jurisdiction to enforce the CSA.

**D.    Federal Jurisdiction Will Not Disrupt the Congressionally Approved Balance of Federal-State Judicial Responsibilities.**

Finally, recognizing federal jurisdiction would not disturb the division of labor between state and federal courts. Federal courts are *already* the exclusive fora for determining the permissible scope of restraints on Distributors under the CSA and exclusively hear challenges to DEA authority to enforce the CSA against distributors.[6] Similarly, federal courts have exclusive jurisdiction over proceedings to enjoin violations of the CSA. *See* 21 U.S.C. § 882(a) ("The district courts of the United States and all courts exercising general jurisdiction in the territories and possessions of the United States shall have jurisdiction in proceedings . . . to enjoin violations of this subchapter."). Thus, federal courts already exercise jurisdiction over the federal issues here.

**IV.    THE REMAND DECISIONS CITED BY PLAINTIFFS ARE DISTINGUISHABLE AND THE MDL COURT HAS NOT REJECTED THE REMOVAL THEORY.**

Plaintiffs attempt to distract from their reliance on federal law by citing remand decisions from opioid-related cases in other jurisdictions. (D.E. 7 & n.16.) These nonbinding and inapposite district court decisions do not alter the analysis here.

To begin with, some of the cases that Plaintiffs cite involve different removal theories than this case. For example, Plaintiffs cite a remand order in *Cty. of Dallas v. Purdue*, No. 3:18-cv-00426 (N.D. Tex. Mar. 7, 2018), D.E. 10, but those defendants removed that action based on diversity jurisdiction, *not* federal question jurisdiction. That order thus has no relevance here.

Among the remand decisions cited by Plaintiffs that actually involved removals based on federal question, many included allegations of state-law statutory violations not present here. The

---

[6] *See, e.g.*, *PDK Labs. Inc. v. DEA*, 362 F.3d 786 (D.C. Cir. 2004) (challenge to DEA program enforcing CSA to prevent diversion of ephedrine); *Admin. Subpoena Walgreen Co. v. DEA*, 913 F. Supp. 2d 243 (E.D. Va. 2012) (resolving registrant's motion to require DEA to return subpoenaed documents); *Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203 (D.D.C. 2012) (challenging DEA order suspending registration of distribution facility).

4827-4521-9479

plaintiffs premised claims not only on violations of the federal CSA, but also on violations of other states' (non-Tennessee) controlled substances acts. *See, e.g.*, *New Mexico v. Purdue Pharma LP*, 323 F. Supp. 3d 1242, 1245 (D.N.M. 2018) (New Mexico Controlled Substances Act); *W. Va. v. McKesson Corp.*, 2017 WL 357307, at *1 (S.D.W. Va. Jan. 24, 2017) (West Virginia Uniform Controlled Substances Act); *Del. v. Purdue Pharma LP*, 2018 WL 1942363, at *1 (D. Del. Apr. 25, 2018) (Delaware Controlled Substances Act). By contrast, Plaintiffs rely exclusively on alleged violations of the federal CSA and fail to locate any parallel state-law statutory requirements.

The decisions that Plaintiffs cite also fundamentally understate the critical importance of the CSA to the federal Government. The *New Mexico* decision, for instance, posited that interpretations of the CSA did not implicate "large-scale federal interests," *New Mexico*, 323 F. Supp. 3d at 1252, despite the federal Government's expression of interest in actions that bear on the its ability to enforce a nationwide regulatory scheme for controlled substances. *See* Ex. 2 at 7.

Plaintiffs also incorrectly maintain that the MDL court has twice rejected McKesson's removal theory. (D.E. 19 at 8.) In support, Plaintiffs cite two orders. *See In re Nat'l Prescription Opiate Litig.*, 2018 WL 4019413 (N.D. Ohio Aug. 23, 2018) ("*Montana Order*"); *In re Nat'l Prescription Opiate Litig.*, 2019 WL 180246 (N.D. Ohio Jan. 14, 2019) ("*Kentucky Order*").

As an initial matter, the MDL court withdrew as moot the *Kentucky Order* just three days after issuing it. *See In re Nat'l Prescription Opiate Litig.*, No. 1:18-op-46311-DAP (N.D. Ohio Jan. 17, 2019), D.E. 15 (attached as **Ex. 3**) ("[T]he Court hereby withdraws its previous Opinion and Order as moot . . . ."). That order is thus of no legal effect. *See United States v. Sigma Int'l, Inc.*, 300 F.3d 1278, 1280 (11th Cir. 2002) (vacated opinions "are officially gone. They have no legal effect whatever. They are void. None of the statements made in either of them has any remaining force and cannot be considered to express the view of th[e] [issuing] Court.").

4827-4521-9479

The *Montana Order* is also inapplicable because its removal was based on a different federal statute—the Food, Drug, and Cosmetic Act (FDCA)—and the defendants were pharmaceutical manufacturers regulated by the FDCA, not distributors regulated by the CSA. *Montana Order*, at *1-2. Unlike Montana, Plaintiffs affirmatively allege that Distributors violated the federal CSA—not the FDCA—and, unlike Montana's claims, Plaintiffs' claims rest on those alleged violations of the CSA. Because the basis for removal in the *Montana Order* involved a different statute and a different factual context, it does not bear on the removal theory here.

Finally, Plaintiffs ignore that multiple courts conducting preliminary assessments of the same jurisdictional issue have concluded that defendants' bases for removal are plausible or, at a minimum, present legally and factually difficult issues. *See, e.g.*, *Portland v. Purdue Pharma LP*, No. 2:18-cv-00282 (D. Me. Nov. 28, 2018), D.E. 96 ("Defendants have asserted a plausible basis for removal[.]"); *Melrose Park v. McKesson Corp.*, No. 1:18-cv-05288 (N.D. Ill. Aug. 10, 2018), D.E. 26 ("Preliminary assessment of the jurisdictional issues suggest that they are legally and factually difficult[.]"); *Osage Cty. v. Purdue Pharma LP*, No. 4:18-cv-00461 (N.D. Okla. Nov. 14, 2018), D.E. 87 ("A preliminary assessment of the jurisdictional issues in this case suggests that they are not straightforward."). In staying proceedings in an action removed on the same grounds as this case, one court concluded that, "at first blush, jurisdiction does not appear to be lacking in this case," and "the existence of these difficult questions of jurisdiction weigh in favor of their resolution by one court making similar rulings in hundreds of similar cases." *Seminole Cty. v. Purdue Pharma LP,* No. 6:18-cv-00372 (E.D. Okla. Apr. 3, 2019), D.E. 51 at 5.

## V.     PLAINTIFFS' REQUEST FOR FEES AND COSTS SHOULD BE DENIED.

Even if this Court were to remand, it should deny Plaintiffs' request for fees under 28 U.S.C. § 1447(c) (D.E. 19 at 11-12). The bar for an award is high and Plaintiffs do not come close to meeting it. Such awards may be given "only where the removing party lacked an objectively

4827-4521-9479

reasonable basis for seeking removal." *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 141 (2005). "Conversely, when an objectively reasonable basis exists, fees should be denied." *Id.*

Denying a request for fees and costs is especially warranted in cases involving federal-question removal because such "[r]emoval jurisprudence is a developing area." *Parrish v. ARC of Morris Cty. LLC*, 193 F. Supp. 3d 425, 435 (D.N.J. 2016). Likewise, courts have also found that fees are not warranted in nationwide cases involved in federal MDL actions. *Lougy v. Volkswagen Grp. of Am., Inc.*, 2016 WL 3067686, at *4 (D.N.J. May 19, 2016) (denying request for fees in "a nationwide complex case" where "[m]any cases have been consolidated in the federal MDL action"). For these reasons, even when this Court grants motions to remand, it regularly denies requests for fees and costs. *See, e.g.*, *Norma Faye Pyles Lynch Family Purpose, LLC v. City of Cookeville*, 207 F. Supp. 3d 825, 832 (M.D. Tenn. 2016) ("Here, the Court exercises its discretion by declining to award fees and costs."); *Tenn. Ins. Guar. Ass'n v. Penguin Random House, LLC*, 271 F. Supp. 3d 959, 967 (M.D. Tenn. 2017) ("[The] request for attorney's fees will be denied.").

Here, McKesson has a good faith, objectively reasonable basis for removal. Neither this District nor the Sixth Circuit has addressed whether state-law claims predicated on violations of the CSA raise substantial federal issues. Moreover, a number of district courts have concluded that McKesson's basis for removal is plausible or legally difficult. *See supra* Part V.

## CONCLUSION

For the reasons set forth above, McKesson respectfully requests the Court deny Plaintiffs' motion to remand.

4827-4521-9479

May 20, 2019

s/ *John-David H. Thomas*
John-David H. Thomas (TN BPR No. 027582)
Robert D. Boon (TN BPR No. 033217)
WALLER LANSDEN DORTCH & DAVIS, LLP
Nashville City Center
511 Union Street, Suite 2700
Nashville, Tennessee 37219
Telephone:     (615) 244-6380
Facsimile:     (615) 244-6804
Email:          jd.thomas@wallerlaw.com
                jaz.boon@wallerlaw.com

Jeffrey C. Smith (TN BPR No. 016295)
WALLER LANSDEN DORTCH & DAVIS, LLP
1715 Aaron Brenner Drive, Suite 300
Memphis, Tennessee 38120
Telephone:     (901) 288-1700
Facsimile:     (901) 288-1706
Email:          jeff.smith@wallerlaw.com

*Attorneys for McKesson Corporation*

4827-4521-9479

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2019, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail. Parties may access this filing through the Court's electronic filing system.

James G. Stranch, III
J. Gerard Stranch, IV
Tricia A. Herzfeld
Benjamin A. Gastel
Anthony Orlandi
BRANSTETTER, STRANCH, & JENNINGS, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone:     (615) 254-8801
Facsimile:      (615) 855-5419
Email:            jims@bsjfirm.com
                     gerards@bsjfirm.com
                     triciah@bsjfirm.com
                     beng@bsjfirm.com
                     aorlandi@bsjfirm.com


Henry D. Fincher
LAW FIRM OF HENRY D. FINCHER
305 East Spring Street
Cookeville, TN 38501
Telephone:     (931) 538-4000
Facsimile:      (931) 528-6368
Email:            henry@henryfincherlaw.com

*Attorneys for Plaintiffs*


Aubrey B. Harwell, Jr. (BPR # 2559)
James G. Thomas (BPR # 7028)
William J. Harbison II (BPR # 33330)
NEAL & HARWELL, PLC
1201 Demonbreun Street
Nashville, TN 37213
(615) 244-1713
aharwell@nealharwell.com
jthomas@nealharwell.com

4827-4521-9479

22

jharbison@nealharwell.com

Sheila L. Birnbaum
Mark S. Cheffo
Hayden A. Coleman
Jonathan S. Tam
DECHERT LLP
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
sheila.birnbaum@dechert.com
mark.cheffo@dechert.com
hayden.coleman@dehert.com
jonathan.tam@dechert.com

*Attorneys for Purdue Defendants*

Tim Warnock (TN Bar No. 012844)
Stuart Burkhalter (TN Bar No. 029078)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Ave.
Nashville, TN 37203
(615) 320-3700
twarnock@rwjplc.com
sburkhalter@rwjplc.com

Steven A. Reed
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
(215) 963-5000
steven.reed@morganlewis.com

Tinos Diamantatos
Megan R. Braden
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive
Chicago, IL 60601
(312) 324-1145
tinos.diamantatos@morganlewis.com
megan.braden@morganlewis.com

*Attorneys for Teva Pharmaceuticals USA, Inc.*

4827-4521-9479

Jessalyn H. Zeigler (TN Bar No. 016139)
Sarah B. Miller (TN Bar No. 033441)
BASS, BERRY, & SIMS PLC
150 Third Avenue South Suite 2800
Nashville, TN 37201
(615) 742-6200
jzeigler@bassberry.com
smiller@bassberry.com

Kenneth M. Chadwell (TN Bar No. 018586)
LOONEY, LOONEY & CHADWELL PLLC
The Lawyers Building
156 Rector Avenue
Crossville, TN 38555
(931) 250-5094
kmchadwell@looneychadwell.com

Brien J. O'Connor
Andrew J. O'Connor
ROPES & GRAY LLP
Prudential Tower, 800 Boylston Street
Boston, MA 02199
(617) 235-4650
Brien.O'Connor@ropesgray.com
Andrew.O'Connor@ropesgray.com

*Attorneys for Mallinckodt LLC*


Ronald S. Range, Jr. (TN Bar No. 013928)
BAKER, DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC
100 Med Tech Parkway, Suite 200
Johnson City, TN 37604
(423) 975-7602
rrange@bakerdonelson.com

Ingo W. Sprie, Jr.
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
Ingo.Sprie@arnoldporter.com

*Attorneys for Endo Health Solutions Inc. and Endo Pharmaceuticals Inc.*


4827-4521-9479

Lela M. Hollabaugh (TN BPR#14894)
BRADLEY ARANT BOULT CUMMINGS LLP
1600 Division Street, Suite 700
Nashville, TN 37203
Telephone: 615.252.2348
Facsimile: 615.252.6348
lhollabaugh@bradley.com

***Attorney for Cardinal Health, Inc.; Cardinal Health Pharmacy Services, LLC; Cardinal Health Specialty Pharmacy, LLC***


Roger W. Dickson (TN BPR No. 001933)
Kyle W. Eiselstein (TN BPR No. 020727)
MILLER & MARTIN, PLLC
Volunteer Building, Suite 1200
832 Georgia Avenue
Chattanooga, TN 37402
Telephone: (423) 785-8352
Facsimile: (423) 321-1517
Roger.dickson@millermartin.com
kyle.eiselstein@millermartin.com

Michael J. Salimbene (PA Bar # 209664)
REED SMITH LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, Pennsylvania 19103
(215) 851-8100
msalimbene@reedsmith.com
(Not licensed in TN)

***Attorney for AmerisourceBergen Drug Corporation***


Nathan Bicks
Ryan G. Saharovich
BURCH, PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, TN 38103
(901) 524-5000
nbicks@bpjlaw.com
rsaharovich@bpjlaw.com

Conor B. O'Croinin
ZUCKERMAN SPAEDER LLP

4827-4521-9479

100 East Pratt Street, Suite 2440
Baltimore, Maryland
cocroinin@zuckerman.com

***Attorneys for CVS Pharmacy, Inc.***


Don L. Hearn (#22837)
Larry Montgomery (#9579, M. D. Tenn. App. Pending)
GLANKLER BROWN
6000 Poplar Avenue, Suite 400
Memphis, TN 38119
(901) 525-1322
E-Mail: lmontgomery@glankler.com
E-Mail: dhearn@glankler.com

Kaspar Stoffelmayr
BARTLIT BECK LLP
54 West Hubbard Street
Chicago, IL  60654
(312) 494-4400

Lester C. Houtz
Alex Harris
BARTLIT BECK LLP
1801 Wewatta Street, 12th Floor
Denver, CO 80202
(303) 592-3100

***Attorneys for Defendants Walgreens Boots Alliance, Inc. and Walgreen Co***


Don L. Hearn (#22837)
Larry Montgomery (#9579, M. D. Tenn. App. Pending)
GLANKLER BROWN
6000 Poplar Avenue, Suite 400
Memphis, TN 38119
(901) 525-1322
E-Mail: lmontgomery@glankler.com
E-Mail: dhearn@glankler.com

Coleen M. Meehan
Elisa P. McEnroe
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103

4827-4521-9479

Telephone: (215) 963-5000
Facsimile: (215) 963-5001
Email: coleen.meehan@morganlewis.com
Email: elisa.mcenroe@morganlewis.com

Kelly A. Moore
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
Telephone: (212) 309-6000
Facsimile: (212) 309-6000
Email: kelly.moore@morganlewis.com

***Attorneys for Defendants Rite Aid Corporation, Rite Aid Hdqtrs. Corp. and Rite Aid of Tennessee, Inc.***

Edward M. Yarbrough (TN BPR # 004097)
W. Justin Adams (TN BPR #0022433)
BONE MCALLESTER NORTON PLLC
511 Union Street, Suite 1600
Nashville, Tennessee 37219
Telephone 615-238-6300
Facsimile 615-238-6301
eyarbrough@bonelaw.com
wjadams@bonelaw.com

***Attorneys for Mark Murphy and North Alabama Pain Services, LLC***

Daniel J. Murphy (TN BPR # 033887)
DANIEL J. MURPHY ATTORNEY AT LAW
1337 Antioch Pike
Nashville, TN 37211
Tennessee Bar No. 033887
Telephone: 931-422-8304
Facsimile: 615-523-1254
danielmurphy@danmurph.com

***Attorney for Montclair Health & Wellness LLC c/b/a Specialty Associates***

Lynnville Family Medical Clinic
118 2nd Avenue South
Lewisburg, Tennessee 37091

4827-4521-9479

Center for Advanced Medicine, LLC
c/o Jason L. Huskey
514 Hillsboro Boulevard
Manchester, TN 37355
Telephone:     (931) 728-1800
Facsimile:     (931) 728-1801


Nathan Paul Haskins
20 Jones Circle
Old Hickory, Tennessee 37138


David Florence
70 Big Falls Circle
Manchester, Tennessee 37355

/s/ *John-David H. Thomas*
John-David H. Thomas (TN BPR No. 027582)
Robert D. Boon (TN BPR No. 033217)
WALLER LANSDEN DORTCH & DAVIS, LLP
Nashville City Center
511 Union Street, Suite 2700
Nashville, Tennessee  37219
Telephone:     (615) 244-6380
Facsimile:     (615) 244-6804
Email:          jd.thomas@wallerlaw.com
                jaz.boon@wallerlaw.com

Jeffrey C. Smith (TN BPR No. 016295)
WALLER LANSDEN DORTCH & DAVIS, LLP
1715 Aaron Brenner Drive, Suite 300
Memphis, Tennessee 38120
Telephone:     (901) 288-1700
Facsimile:     (901) 288-1706
Email:          jeff.smith@wallerlaw.com

*Attorneys for McKesson Corporation*