# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **BRYANT C. DUNAWAY, et al.** ) <br> ) <br>     **Plaintiffs,** ) <br> ) <br> **v.** ) <br> ) <br> ) <br> **PURDUE PHARMA L.P., et al.,** ) <br> ) <br>     **Defendants.** ) | **Case No. 2:19-cv-00038** <br> **Judge Aleta A. Trauger** |

## MEMORANDUM & ORDER

The plaintiffs have filed a Motion to Remand (Docket No. 18), to which McKesson Corporation ("McKesson") has filed a Response (Docket No. 54), and the plaintiffs have filed a Reply (Docket No. 56). McKesson, Cardinal Health, Inc., and AmerisourceBergen Drug Corporation ("Moving Defendants") have filed a Joint Motion to Stay Proceedings (Docket No. 29), to which the plaintiffs have filed a Response (Docket No. 41). For the reasons set out herein, the Moving Defendants' motion will be denied, and the plaintiffs' motion will be granted.

## I. BACKGROUND

The plaintiffs are District Attorneys General from judicial districts including Bedford County, Cannon County, Clay County, Giles County, and Van Buren County, along with Baby Doe, an infant allegedly born dependent on opioids. They filed suit against the defendants—a number of pharmaceutical companies, pharmacies, clinics, and individuals—in Cumberland County Circuit Court, alleging liability arising out of the defendants' actions related to opioid medications, including, in particular, many defendants' alleged filling of suspicious orders for opioid medications. The plaintiffs have pleaded two causes of action under the Tennessee Drug

1

Dealer Liability Act ("TDDLA"), Tenn. Code Ann. §§ 29-38-101 to -116, one on behalf of Baby Doe and one on behalf of the DAGs' judicial districts. (Docket No. 1-3 ¶¶ 627–682.) On May 3, 2019, one of the defendants, McKesson Corporation, filed a Notice of Removal removing the case to federal court. (Docket No. 1.) As the basis for removal, McKesson asserted that, although the plaintiffs have pleaded only state-law causes of action, their claims "arise under federal law" for jurisdictional purposes because they involve duties under the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq.* (Docket No. 1 ¶ 23.) The defendants point out that the plaintiffs' Second Amended Complaint alleges a number of CSA violations, including violations of the duty, under 21 U.S.C. § 823 and related regulations and DEA guidance, to report and suspend suspicious orders of opioid medications and to exercise due diligence to avoid filling orders that might be diverted to unlawful uses. *See Masters Pharm., Inc. v. DEA*, 861 F.3d 206, 212 (D.C. Cir. 2017) (discussing duties of prescription drug distributors under the CSA). (Docket No. 1-3 ¶¶ 305, 308, 329, 351.)

The plaintiffs are far from the only parties to notice that pharmaceutical manufacturers, distributors, pharmacies, and others might face liability related to their sale, marketing, and/or distribution of dangerous and addictive opioids. Currently pending before Judge Dan Polster of the Northern District Ohio is multidistrict litigation ("MDL") that includes more than 1,800 opioid-related actions, including several originally filed in this district. Contemporaneously with the removal, one of the defendants, Purdue Pharma L.P., filed a notice with the Judicial Panel on Multidistrict Litigation ("JPML") seeking to have this case transferred into that MDL.

On May 10, 2019, the plaintiffs filed a Motion to Remand (Docket No. 18) in this court, arguing that the removal of the case to federal court was improper. Shortly thereafter, the Moving Defendants filed a Joint Motion to Stay Proceedings (Docket No. 29), arguing that the court should

2

stay any consideration of the remand motion until the JPML determines whether the case will be transferred into the MDL. On May 16, 2019, the JPML entered a Conditional Transfer Order (Docket No. 44), proposing that the case be transferred into the MDL. Consistently with JPML Rules, the transfer will not take effect until, at the earliest, its entry on the docket of the U.S. District Court of the Northern District of Ohio. (*Id.* at 1.) If a party opposes the transfer, the transfer will be stayed indefinitely. (*Id.*)

## II. LEGAL STANDARD

### A. Stay

A district court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706–07 (1997) (citing *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes [on] its docket with economy of time and effort for itself, for counsel and for litigants, and the entry of such an order ordinarily rests with the sound discretion of the District Court." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 626–27 (6th Cir. 2014) (quoting *Ohio Envtl. Council v. U.S. Dist. Court*, 565 F.2d 393, 396 (6th Cir. 1977)).

The Rules of Procedure of the U.S. Judicial Panel on Multidistrict Litigation expressly provide that the pendency of the Conditional Transfer Order has no bearing on this court's ability to consider a pretrial matter pending in a case filed in or removed to this court. *See* JPML R. 2.1(d). Nevertheless, "the district court certainly has discretion to grant a stay in the interests of judicial economy." *Glazer v. Whirlpool Corp.*, No. 1:08-CV-1624, 2008 WL 4534133, at *2 (N.D. Ohio Oct. 6, 2008). When considering a stay pending the resolution of a motion to transfer a case into an MDL, the district court balances the following factors: "(1) potential prejudice to the non-

3

moving party; (2) hardship and inequity to the moving party if the action is not stayed; and (3) the judicial resources that would be saved by avoiding duplicative litigation if the cases are in fact consolidated." *Id.* (quoting *Rivers v. Walt Disney Co.*, 980 F. Supp. 1358, 1360 (C.D. Cal. 1997)).

### B. Remand

Removal from state to federal court is appropriate for "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." *See* 28 USC § 1441(a). However, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). A party also may file a motion to remand based on a "defect other than lack of subject matter jurisdiction," provided that the party does so within 30 days after the filing of the notice of removal. *Id.*

### III. ANALYSIS

### A. Motion to Stay

The Moving Defendants argue that all three of the factors governing its stay request—prejudice to the non-moving parties, hardship to the moving parties, and judicial economy—favor a stay. They point to a number of other cases in which courts have stayed their consideration of remand motions pending the resolution of an MDL transfer request. *See, e.g.*, *Beshear v. Volkswagen Grp. of Am., Inc.*, 2016 WL 3040492, at *8 (E.D. Ky. May 25, 2016); *McGraw-Hill Companies, Inc.*, 2013 WL 1785512, at *7 (M.D. Tenn. Apr. 25, 2013) (Sharp, J.); *Karrels v. Morgan Asset Mgmt., Inc.*, 2010 WL 11565140, at *2 (M.D. Tenn. Jan. 6, 2010) (Echols, J.); *Marshall v. Am. Gen. Life & Accident Ins. Co.*, 174 F. Supp. 2d 709, 718 (M.D. Tenn. 2001) (Nixon, S.J.). (*See also* Docket Nos. 30-1 to -13.) The court, the Moving Defendants argue, should follow the lead of those courts and judges and allow the issue of remand to be resolved either by the MDL court or by this court after a transfer to the MDL has been rejected.

4

This court does not deny that staying consideration of a remand motion pending an MDL transfer decision may often be appropriate. "As other district courts within the Sixth Circuit have recognized, the 'general rule is for federal courts to defer ruling on pending motions to remand in MDL litigation until after the [JPML] has transferred the case.'" *Beshear*, 2016 WL 3040492, at *8 (quoting *Kelly v. Aultman Physician Center*, 2013 WL 2358583, *2 (N.D. Ohio May 29, 2013)). The fact that courts usually handle these matters one way, however, does not relieve this court of the necessity of considering whether a stay is warranted here. Indeed, the JPML's own rules explicitly make clear that no stay is mandated here, leaving the decision on how to proceed up to the original district court. JPML R. 2.1(d).[1] Based on the court's balancing of the factors relevant to whether a stay should be granted, the court concludes that proceeding with consideration of the plaintiffs' motion is warranted.

First, the risk of hardship resulting from a postponement of a jurisdictional determination is great. If transferred, this case will join a veritable sea of others in the MDL court. There is no guarantee of when that heavily burdened court would be able to address the important jurisdictional issues raised here. This court, however, is prepared to address those jurisdictional issues now. The prospect of indefinitely postponing a jurisdictional ruling is especially troubling, given that this case involves Tennessee public officials, charged with representing the interests of the citizens of their respective judicial districts, seeking access to the state's courts to assert claims under the state's laws. There is nothing inherently objectionable about a federal court considering state-law claims involving state and local officials, as long as it does so pursuant to its limited

---

[1] "The pendency of a motion, order to show cause, conditional transfer order or conditional remand order before the Panel pursuant to 28 U.S.C. § 1407 does not affect or suspend orders and pretrial proceedings in any pending federal district court action and does not limit the pretrial jurisdiction of that court. An order to transfer or remand pursuant to 28 U.S.C. § 1407 shall be effective only upon its filing with the clerk of the transferee district court." JPML R. 2.1(d).

5

constitutional and statutory jurisdiction. If that jurisdiction is lacking, however, the case should be returned to the state courts as soon as reasonably practicable. Otherwise, the federal courts will not only waste the parties' time but impair the state's interest in the administration of justice.

Staying matters while the JPML determines whether to transfer a case can sometimes serve the interests of judicial economy by preventing a district court from "needlessly expend[ing] its energies familiarizing itself with the intricacies of a case that w[ill] be heard by another judge" or making decisions that "will most likely have to be replicated by the judge that is assigned to handle the consolidated litigation." *Rivers*, 980 F. Supp. at 1360. Neither of those concerns, however, is present here. Resolving the discrete jurisdictional and procedural objections raised by the plaintiffs will not require this court to immerse itself in the intricacies of the case in full, and addressing the issue of jurisdiction now may, if anything, save the potential transferee court the unnecessary labor and attention that would accompany dealing with a case that the federal courts should not be considering in the first place.

The interests of judicial economy are furthered by putting a case, as expeditiously as possible, in a court that has the jurisdiction to resolve it. It would not be a good use of judicial resources for the JPML to devote its time and attention to a transfer from one federal court to another, if the ultimate legal reality is that neither court has or can have jurisdiction. Nor would it be a good use of the transferee court's resources for that court to have to deal with the intake and processing of a case only to realize, later, that the case should be in state court. "It would be a waste of judicial resources for [a] case to proceed" in the federal courts if, ultimately, a federal court is not "the appropriate court to consider plaintiffs' claims." *State v. United States Envtl. Prot. Agency*, No. 2:15-CV-2467, 2015 WL 5117699, at *3 (S.D. Ohio Sept. 1, 2015). This court can

6

imagine few greater wastes of a court's resources than consideration of a case that the court has no jurisdiction to decide.

The Moving Defendants argue that declining to stay the court's consideration of the remand motion would cause it significant prejudice by potentially placing this case on a "separate track" from the numerous other opioid-related suits that are already being litigated in the MDL. (Docket No. 30 at 8.) But that is a risk of the remand motion, not a risk related to the denial of a stay; a post-transfer remand would result in cases on different tracks just as much as a pre-transfer remand would. More importantly, the Moving Defendants' argument loses sight of the fact that, if this case is not properly in the federal courts (either because we lack jurisdiction or because the removal was defective), then the case *should* be on a different track. Different litigation under different laws in different states is inherent to the federal system embraced by the limited jurisdiction of the federal courts. The court, accordingly, will not stay its consideration of the plaintiffs' motion.

## B. Motion to Remand

The plaintiffs argue that this case should be remanded to state court for two independent reasons: first, because the federal courts lack subject matter jurisdiction over the claims alleged; and, second, because McKesson Corporation failed to obtain consent for removal from all properly served defendants, as required by 28 U.S.C. § 1446(b)(2)(A).

### *1. Subject Matter Jurisdiction.*

"The 'arising under' gateway into federal court . . . has two distinct paths: 1) 'litigants whose causes of action are created by federal law,' and 2) 'state-law claims that implicate significant federal issues.'" *Estate of Cornell v. Bayview Loan Servicing, LLC*, 908 F.3d 1008, 1012 (6th Cir. 2018) (quoting *Hampton v. R.J. Corman R.R. Switching Co.*, 683 F.3d 708, 711 (6th Cir. 2012)). Because the plaintiffs have pleaded only state causes of action, the defendants must

7

rely on the latter path—implication of significant federal issues—in support of their removal. A court attempting to determine whether a state-law claim implicates significant federal issues must "ask whether (1) 'a state-law claim necessarily raise[s] a stated federal issue,' (2) that is 'actually disputed and substantial,' (3) 'which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.'" *Id.* (quoting *Grable & Sons Metal Prod., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005)).

The litigation of a state-law cause of action may raise an issue of federal law at any number of stages. For example, discovery in a state-law case might involve documents that must be handled in a way that complies with federal privacy laws, or a jury in a state common law tort case might grant punitive damages that raise Fourteenth Amendment concerns. Not every situation in which federal law comes up, however, counts as the federal issue having been "necessarily raised" by the state cause of action. "It is long settled law that a cause of action arises under federal law only when the plaintiff's well-pleaded complaint raises issues of federal law. The 'well-pleaded complaint rule' is the basic principle marking the boundaries of the federal question jurisdiction of the federal district courts." *Metro. Life Ins. Co., v. Taylor*, 481 U.S. 58, 63 (1987) (citations omitted); *see also Hampton v. R.J. Corman R.R. Switching Co.*, 683 F.3d 708, 711 (6th Cir. 2012) (citing *Merrell Dow Pharm., Inc., v. Thompson*, 478 U.S. 804, 808 (1986)). "[T]he presence of a federal question . . . in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule—that the plaintiff is the master of the complaint, that a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 398–99 (1987).

"In 2005, the [Tennessee] General Assembly enacted the [TDDLA] to provide persons injured by illegal drugs with a civil cause of action for damages against persons who knowingly participate in the illegal drug market in Tennessee." *Waters v. Farr*, 291 S.W.3d 873, 915 (Tenn. 2009). One purpose of the Act is "to shift, to the extent possible, the cost of the damage caused by the existence of the illegal drug market in a community to those who illegally profit from that market." Tenn. Code Ann. § 29-38-102. The General Assembly set out to craft a cause of action that could be wielded against "all participants in the illegal drug market," but particularly those "not usually the focus of criminal investigations." Tenn. Code Ann. § 29-38-103(4). An "illegal drug," under the statute, is any "drug, the distribution of which is a violation of state law." Tenn. Code Ann. § 29-38-104(1). The Act allows certain people and entities, including those that expend money on treatment of drug users, to seek damages against:

(1) A person[2] who knowingly distributed, or knowingly participated in the chain of distribution of, an illegal drug that was actually used by the individual drug user [underlying the case]; [or]
(2) A person who knowingly participated in the illegal drug market, if:
    (A) The place of illegal drug activity by the individual drug user is within the illegal drug market target community of the defendant;
    (B) The defendant's participation in the illegal drug market was connected with the same type of illegal drug used by the individual drug user; and
    (C) The defendant participated in the illegal drug market at any time during the individual drug user's period of illegal drug use.

Tenn. Code Ann. § 29-38-106(b). "'Illegal drug market' means the support system of illegal drug related operations, from production to retail sales, through which an illegal drug reaches the user." Tenn. Code Ann. § 29-38-104(2).

As the plaintiffs point out, the TDDLA expressly premises liability only on actions related to a drug the distribution of which is illegal under Tennessee law. See Tenn. Code Ann. § 29-38-

---

[2] Under the TDDLA, "'[p]erson' means an individual, governmental entity, corporation, firm, trust, partnership, or incorporated or unincorporated association, existing under or authorized by the laws of this state, another state, or foreign country." Tenn. Code Ann. § 29-38-104(11).

9

104(1). If, hypothetically, Tennessee were to elect not to prohibit the distribution of some drug, the distribution of which was prohibited by federal law, then a plaintiff could not sue for damages related to that drug under the TDDLA; that hypothetical drug would not meet the definition of "illegal drug" set out in the Act. As a practical matter, Tennessee law and federal law impose overlapping prohibitions on distribution and possession of certain drugs, but, under the TDDLA, that overlap does not matter. If a plaintiff cannot show a violation of Tennessee law, all the federal violations in the world will not be enough to create liability. By the same token, if a drug is illegal to distribute in Tennessee, TDDLA liability can attach regardless of federal policy.

Under Tennessee law, opioid medications are Schedule II controlled substances. Tenn. Code Ann. § 39-17-408(b)(1). Distribution of a controlled substance, at least generally speaking, is unlawful pursuant to Tenn. Code Ann. § 39-17-417. Tennessee's statutes defining drug offenses in the state recognize an exception, however, if "the person lawfully possessed the controlled substance as otherwise authorized by this part and title 53, chapter 11, parts 3 and 4." Tenn. Code Ann. § 39-17-427. The cited parts of title 53 contain Tenn. Code Ann. §§ 53-11-301 to -452, governing "persons[3] who may legally dispense controlled substances" and the "manufacture, distribution, dispensing, warehousing of, and the provision of logistics services for controlled substances within this state." Tenn. Code Ann. § 53-11-301. Those provisions include express requirements for when and how opioids may be dispensed, Tenn. Code Ann. § 53-11-308, and a prohibition on "distribut[ing] or dispens[ing] any controlled substance for any purposes other than those authorized by and consistent with the person's professional or occupational licensure or registration law, or to distribute or dispense any controlled substance in a manner prohibited by

---

[3] The definition of "person," under Tennessee's food, drugs, and cosmetics laws, "includes an individual, partnership, corporation[, or] association." Tenn. Code Ann. § 53-1-102(26).

10

the person's professional or occupational licensure or registration law," Tenn. Code Ann. § 53-11-401(a)(1).

That latter provision is the one most likely to give rise to a federal issue in this case. Whether an entity's distribution of opioids in Tennessee is lawful depends on whether the distributor is acting consistently with its "professional or occupational licensure or registration law." The CSA provisions and regulations cited in the plaintiffs' Second Amended Complaint are part of the federal registration scheme for manufacturers and distributers of controlled substances found in 21 U.S.C. § 823. Tenn. Code Ann. § 53-11-401(a)(1) does not specifically say that the federal CSA registration law is one of the laws with which a distributor or manufacturer must comply, but construing the statute as such would be consistent with its purpose and its plain language. The plaintiffs' inclusion of the alleged CSA violations in their Second Amended Complaint is consistent with their reliance on such a theory. Accordingly, the plaintiffs have raised one theory of liability that, through multiple layers of state law, ultimately does incorporate federal requirements.

Even if there is some federal law lurking in part of the plaintiffs' Second Amended Complaint, however, jurisdiction can only arise if that federal issue is "necessarily raised" and "substantial." Some courts have suggested that "a plaintiff's right to relief for a given claim necessarily depends on a question of federal law only when every legal theory supporting the claim requires the resolution of a federal issue." *Desai v. CareSource, Inc.*, No. 3:18-CV-118, 2019 WL 1109568, at *3 (S.D. Ohio Mar. 11, 2019) (quoting *Dominion Pathology Labs., P.C. v. Anthem Health Plans of Va., Inc.*, 111 F.Supp.3d 731 (E.D. Va. 2015)). Insofar as that is the test, the defendants have plainly failed to meet it. While a CSA violation may be one way for some of the defendants to be held liable under the TDDLA, it is one of many that the plaintiffs have alleged,

11

and others rely wholly on state law. Moreover, the plaintiffs allege similar, overlapping registration requirements under Tennessee law. *See* Tenn. Code Ann. §§ 53-11-302 to -303; Tenn. Comp. R. & Regs. 1140-02-.01 to -03-.17; Tenn. Comp. R. & Regs. 1140-09-.01 to -.06. Ultimately, then, a CSA violation is just one alternative way for the plaintiffs to make their case, and, if they do make out a claim that amounts to a CSA violation, that CSA violation may well turn out to be entirely redundant of state law violations. *See New Mexico ex rel. Balderas v. Purdue Pharma L.P.*, 323 F. Supp. 3d 1242, 1252 (D.N.M. 2018) (remanding case where state-law claims could be based on either CSA or federal obligations); *W. Va. ex rel. Morrisey v. McKesson Corp.*, No. CV 16-1772, 2017 WL 357307, at *8 (S.D.W. Va. Jan. 24, 2017) (remanding case because federal law was not "the only possible source of a putative duty to avoid filling suspicious orders" for opioids).

Even if one applies the "necessarily raise" requirement less stringently, the relatively limited role of the CSA in the plaintiffs' case undermines any argument that the federal issue raised is, in the context of this case, substantial. The Supreme Court has held the mere "presence of a claimed violation of [a federal] statute as an element of a state cause of action" does not necessarily present a federal issue that is sufficiently "'substantial' to confer federal-question jurisdiction." *Merrell Dow*, 478 U.S. at 814. The substantiality analysis looks to four factors: "(1) 'whether the case includes a federal agency, and particularly, whether the agency's compliance with the federal statute is in dispute'; (2) 'whether the federal question is important (i.e. not trivial)'; (3) 'whether a decision on the federal question will resolve the case (i.e. the federal question is not merely incidental to the outcome)'; and (4) 'whether a decision on the federal question will control many other cases (i.e. the issue is not anomalous or isolated).'" *Cornell*, 908 F.3d at 1015 (quoting *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 570 (6th Cir. 2007) (en banc)). In a vacuum, the question of when a distributor is in compliance with the CSA registration scheme is an

12

important one, and the sheer number of defendants in this case (and opioid cases pending) suggests that these issues are not anomalous. There is, however, little basis for concluding that a decision on the federal issue will "resolve the case," because even absent a finding of a CSA violation, the plaintiffs will have numerous other routes for prevailing under the TDDLA.

McKesson argues that the state-law grounds for finding liability under the TDDLA are insufficient because none of the cited provisions specifically includes a duty to report and refuse to fill "suspicious orders." The precise boundaries of the cited Tennessee law, however, present an issue of merits, not jurisdiction. *See Uintah Cty., Utah v. Purdue Pharma, L.P.*, No. 2:18-CV-00585-RJS, 2018 WL 3747847, at *6 (D. Utah Aug. 7, 2018) (rejecting same argument, regarding Utah law, because the validity of the independent state sources of the duties alleged were merits issues). Moreover, McKesson's argument relies, unconvincingly, entirely on the lack of specific language about "suspicious" orders in the relevant Tennessee statutes. Those statutes, however, merely reach the same issue from a different direction. Tennessee law specifically prohibits the distribution of opioid medications for improper purposes. Tenn. Code Ann. § 53-11-401(a)(1). A violation of that provision precludes a party from relying on the Tenn. Code Ann. § 39-17-427 exception to the prohibition on distribution of controlled substances, which, in turn, renders the drugs "illegal" for purposes of the TDDLA, Tenn. Code Ann. § 29-38-104(1), at least as it is being interpreted by the plaintiffs. The TDDLA attributes liability to a "knowing" distribution or facilitation of the distribution of those illegal drugs. Tenn. Code Ann. § 29-38-106(b). The question of just how "suspicious" an order has to be before a pharmacist or distributor can be treated as "knowingly" in violation of state law may be a thorny one, but there is no reason to think that the lack of the specific word "suspicious" in the relevant statutes confers some kind of blanket immunity. *See Balderas*, 323 F. Supp. 3d at 1251 (remanding case despite the fact that the relevant

13

state-law provisions contained no specific "requirement compelling the Distributor Defendants to halt suspicious orders").

Numerous other opioid-related cases involving purely state-law prohibitions have been remanded for similar reasons as those presented by the plaintiffs. *See In re National Prescription Opiate Litig.*, No. 1:17-md-2804, 2018 WL 4019413 (N.D. Ohio Aug. 23, 2018); *Morrisey*, 2017 WL 357307; *City of Reno v. Purdue Pharma, L.P.*, Case No. 3:18-cv-00454-MMD-WGC, 2018 WL 5730158 (D. Nev. Nov. 2, 2018); *Del. ex rel. Denn v. Purdue Pharma, L.P.*, Case No. 1:18-383-RGA, 2018 WL 1942363 (D. Del. Apr. 25, 2018); *Uintah Cty.*, 2018 WL 3747847, at *7; *Weber Cty., Utah v. Purdue Pharma, L.P.*, No 1:18-cv-00089-RJS, 2018 WL 3747846, at *8-9 (D. Utah August 7, 2018); *Balderas*, 323 F.Supp.3d at 1252. As those courts have recognized, the fact that opioid abuse is an issue of national importance that is addressed, to some degree, by federal law in no way undermines the power of states to craft independent responses that do not rely on federal law to impose liability. When a state has done so—as Tennessee has done here (by the plaintiffs' theory of the case)—then the appropriate forum for such causes of action are state courts, unless a filing or removing party can establish a recognized basis for federal jurisdiction. Because McKesson has not done so, this court will remand the case.

### *2. Consent of All Defendants*

Moreover, even if jurisdictional issues were not fatal to the removal, McKesson's decision to remove the case without the express consent of all defendants was procedurally improper and would independently warrant a remand. "The rule of unanimity requires that in order for a notice of removal to be properly before the court, all defendants who have been served or otherwise properly joined in the action must either join in the removal, or . . . consent to the removal." *Brierly v. Alusuisse Flexible Packaging, Inc.*, 184 F.3d 527, 533 n.3 (6th Cir. 1999). The plaintiffs have

14

identified four defendants who did not consent to removal: Paul Haskins, David Florence, Lynnville Family Medical Center, LLC ("LFMC"), and the Center for Advanced Medicine, LLC ("CAM"). McKesson argues that three of those defendants—Florence, Haskins, and LFMC—were not properly served and that the fourth, CAM, is a nominal defendant whose consent was not required because it is a defunct business entity.

With regard to at least one of the allegedly unserved defendants, however—Haskins—McKesson seemingly concedes that it does not actually have any direct evidence that he was not served when the action was commenced. (Docket No. 54 at 6 n.4.) A Declaration by one of McKesson's attorneys suggests, at most, that Haskins, when contacted by McKesson's counsel, was "unable to confirm" service and eventually stopped responding to McKesson's requests for consent. (Docket No. 55 ¶ 7.) The plaintiffs, however, have produced a Return of Service suggesting that Haskins was indeed personally served. (*See* Docket No. 20-1.) The Return of Services states, in a printed header, that it was "Served On: NATHAN PAUL HASKINS," and the private process server has certified, in pen, that the summons was served "by PERSONAL SERVICE AT [address]." (*Id.* at 1.) McKesson argues that the Return of Service is defective because it violates the requirement that proof of service "shall identify the person served and shall describe the manner of service." Tenn. R. Civ. P. 4.03(a). Specifically, McKesson takes issue with the fact that the section of the form filled out in pen by the process server does not expressly clarify that, as the header suggests, the personal service was on Haskins himself. McKesson cites no Tennessee case law in support of its argument that this supposed technical deficiency rendered service insufficient. Absent more, McKesson has not shown that a lack of service or defective service precluded it from having to obtain consent to removal.

15

McKesson argues, in the alternative, that Haskins is a nominal defendant with no actual stake in the litigation. A defendant is nominal if his absence would not "put [the plaintiff] at risk of receiving inadequate relief." *Beasley v. Wells Fargo Bank, N.A. for Certificate Holders of Park Place Sec., Inc.*, 744 F. App'x 906, 915 (6th Cir. 2018) (quoting *Thermoset Corp. v. Bldg. Materials Corp of Am.*, 849 F.3d 1313, 1318 (11th Cir. 2017)). Consistently with that approach, several circuits have held that a defendant is nominal if "there is no real basis for liability against that defendant or where that defendant's interests are not genuinely adverse to the plaintiff." *Geiman v. N. Ky. Water Dist.*, No. 2:13-cv-177, 2014 WL 12573717, at *5 (E.D. Ky. Jan. 16, 2014); *see, e.g.*, *Hartford Fire Ins. Co. v. Harleysville Mut. Ins. Co.*, 736 F.3d 255, 260 (4th Cir. 2013) ("Nominal means simply a party having no immediately apparent stake in the litigation either prior or subsequent to the act of removal."); *Thorn v. Amalgamated Transit Union*, 305 F.3d 826, 833 (8th Cir. 2002) (defining nominal defendants as those "against whom no real relief is sought" and holding that nominal defendants need not join or consent to removal (citation omitted)); *Shaw v. Dow Brands, Inc.*, 994 F.2d 364, 369 (7th Cir. 1993) ("A defendant is nominal if there is no reasonable basis for predicting that it will be held liable."), *abrogated in other part by Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536 (7th Cir. 2006); *Farias v. Bexar Cty. Bd. of Trustees*, 925 F.2d 866, 871 (5th Cir. 1991) ("To establish that non-removing parties are nominal parties, the removing party must show . . . that there is no possibility that the plaintiff would be able to establish a cause of action against the non-removing defendants in state court." (citation and internal quotation marks omitted)).

The Second Amended Complaint contains specific allegations against Haskins pursuant to which TDDLA liability could be found, namely that Haskins was an active dealer of hydrocodone for illegal purposes, for which he was charged, convicted via a guilty plea, and sentenced to a

16

suspended sentence of incarceration and supervised probation (which he eventually violated, resulting in an order to serve 150 days in jail). (*See* Docket No. 1-3 ¶¶ 425–28, 653–54, 676.) He is, therefore, genuinely adverse to the plaintiffs and potentially liable for damages. Moreover, it is clear that the corporate defendants intend to defend themselves aggressively in this litigation, and there can be little doubt that their defenses will include the argument that the true parties responsible for opioid drugs finding their way onto the illegal market are low-level, criminal dealers such as Haskins. It is hard to imagine why McKesson should be permitted to choose its preferred forum for litigation by arguing that Haskins is a mere incidental entity, only to heap all culpability onto him and others like him when the parties reach the merits stage.

McKesson argues that Haskins is nevertheless a nominal party because he has, so far, failed to contest the claims against him, and the plaintiffs have not yet sought an entry of default or discovery from him. Haskins' inaction, however—either because he has simply failed to look after his own interests or because he has made a strategic decision to lie low and attempt to piggyback onto the success of his presumably much wealthier codefendants—does not negate his very real stakes in this litigation. The plaintiffs' decision not to seek an entry of default while so many other claims remain pending, moreover, has no bearing on the nature of the claims that Haskins faces. Accordingly, even if the court concluded that it had jurisdiction, it would remand the case based on the lack of unanimous consent to removal.[4]

### C. Attorney's Fees

The plaintiffs argue that they should be granted attorney's fees pursuant to 28 U.S.C. § 1447(c), which permits a court granting a remand motion to "require payment of just costs and any

---

[4] The court's focus on Haskins should not be construed as an acceptance of McKesson's arguments regarding the other three parties cited by the plaintiffs as not having consented to removal. Rather, because Haskins' lack of consent was sufficient to render the removal improper, the court has declined to engage in redundant, fact-intensive inquiries regarding the other non-consenting defendants.

17

actual expenses, including attorney fees, incurred as a result of the removal." This award is within the court's discretion, and a threshold finding of "bad faith, improper purpose, or vexatious or wanton conduct" by the defendant is not necessary. *Morris v. Bridgestone/Firestone, Inc.*, 985 F.2d 238, 240 (6th Cir.1993) (citation omitted). Instead, the plaintiff should receive fees and costs "if fair and equitable under all the circumstances." *Id.* (citation and internal quotation marks omitted). An award of fees is "inappropriate where the defendant's attempt to remove the action was fairly supportable." *Bartholomew v. Town of Collierville*, 409 F.3d 684, 687 (6th Cir. 2005) (citation and internal quotation marks omitted).

The court declines to award attorney's fees. While the court was ultimately unpersuaded by McKesson's assertion of federal jurisdiction, the complex interrelationship of state and federal laws in this area—along with the plaintiffs' decision to include express allegations of CSA violations in their Second Amended Complaint—provided McKesson a fair argument for federal jurisdiction. Moreover, McKesson's difficulties in obtaining consent from all defendants were not the result of a lack of trying, and it was not unreasonable to hope that the court might conclude that the lack of consent from Haskins was, in light of the circumstances, excusable. Ultimately, it is, in the view of the court, fair and equitable to allow the individual parties to shoulder their respective attorney's fees at this stage.

## **CONCLUSION**

For the foregoing reasons, the Moving Defendants' Joint Motion to Stay Proceedings (Docket No. 29) is hereby **DENIED**, the plaintiffs' Motion to Remand (Docket No. 18) is **GRANTED** on the merits and **DENIED** with regard to their request for attorney's fees, and this case is **REMANDED** to the Circuit Court of Cumberland County. Pursuant to JPML Rule 7.1(g),

McKesson is **ORDERED** to transmit a copy of this Memorandum & Order to the JPML and inform the JPML that the case has been remanded.

It is so **ORDERED**.

_____
ALETA A. TRAUGER
United States District Judge